UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| DANIEL M. DWYER, | ) |
| | ) |
|     Petitioner, | ) |
| | ) |
| v. | ) Civil No. 9-379-B-W |
| | ) |
| MAINE, STATE OF,[1] | ) |
| | ) |
|     Respondent | ) |

**RECOMMENDED DECISION ON 28 U.S.C. § 2254 MOTION AND
ORDER ON MOTION TO SUPPLEMENT THE RECORD**

Daniel Dwyer has filed a 28 U.S.C. § 2254 petition challenging his Maine State criminal conviction for gross sexual assault. He claims that his counsel did not perform adequately under the Sixth Amendment of the United States Constitution. The State of Maine has filed a response. There have been contretemps concerning an evidentiary issue centering on certain instant messages that Dwyer attempted to introduce in his state post-conviction proceedings and a later obtained document concerning a protection from abuse proceeding. This evidence is presented to this Court in the context of a motion by Dwyer to supplement the record.

Briefly, the individuals central to Dwyer's prosecution include the victim, DE[2], her mother, Angel Narbonne and step-father Steve Narbonne, and SR[3] a close friend of DE's to whom she made her first complaint, as well as a friend of Dwyer's. At the time of the May 22, 2004, sexual assault, DE lived with her mother and step-father. Dwyer and Steve Narbonne were long-time friends and had spent the previous afternoon and night together drinking at Dwyer's

---

[1]     This case is captioned in accordance with the manner in which Dwyer listed the respondent in his 28 U.S.C. § 2254 petition and the clerk office's docketing thereof. This has long been the practice in this district. The proper respondent for petitions such as this is the custodian of prisoner: the current warden of the Maine State prison. Patricia Barnhart is the current warden of this facility.
[2]     The state courts used the victim's full name. She was thirteen at the time of the assault and fourteen at the time of the trial. At the time of the February 27, 2009, post-conviction order she was weeks shy of eighteen.
[3]     The state courts used this young woman's full name, although there is some confusion over the spelling of her first name. This friend was sixteen at the time of the assault and eighteen at the time of the trial.

residence. The morning of the incident Steve Narbonne went to a painting job at around 8:30 a.m.. DE related at trial that sometime around 10:00 a.m. Dwyer showed up at her house where she was home alone and, after some initial interaction, punched her in the stomach, dragged her up to her mother and step-father's bedroom, forcefully removed her shorts and underpants and proceeded to force her to submit to him performing oral sexual acts for five to ten minutes, got up to close the shade, and when DE tried to escape the room, he punched her again and continued the assault for another five minutes. With respect to SR there was evidence that after DE's report of the assault SR stayed in close contact with Dwyer (suggesting she might not have believed DE's report). Dwyer does not dispute that part of this contact involved Dwyer's supplying alcohol to SR and other minors.

*Discussion*

This Court will not grant a petition for habeas relief "with respect to any claim that was adjudicated on the merits in State court proceedings" unless the Maine court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). The Maine courts' factual findings "shall be presumed to be correct" and Dwyer bears the burden of disproving these factual findings by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). See also O'Laughlin v. O'Brien, 568 F.3d 287, 298 (1st Cir.2009); McCambridge v. Hall, 303 F.3d 24, 34-35 (1st Cir.2002).

"To prevail," on his Sixth Amendment claims premised on the Strickland v. Washington, 466 U.S. 668 (1984) standard, Dwyer "must show both that 'counsel's representation fell below an objective standard of reasonableness,' Strickland, 466 U.S., at 688, and that there is a

'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different,' id., at 694. Smith v. Spisak, __ U.S. __, __, __ S. Ct. __, __, 2010 WL 86341, 7 (Jan 12, 2010). Although Dwyer "must prove both deficient performance and prejudice to prevail on his ineffective assistance of counsel claim, a reviewing court need not address both requirements if the evidence as to either is lacking.  As the Supreme Court has recognized, '[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'" Sleeper v. Spencer, 510 F.3d 32, 39 (1st Cir. 2007) (quoting Strickland, 466 U.S. at 697).

In his federal habeas petition, it is Dwyer's contention that his attorney failed to conduct a reasonable pre-trial investigation.  Rather, counsel chose to make the case a "straight credibility contest" without seeking evidence to support Dwyer's version of events or to bolster Dwyer's credibility.  (Sec. 2254 Pet. at 5.)  He identifies the following shortfalls:

- Counsel did not file a pre-trial motion to challenge or limit the testimony of a state witness who offered prejudicial and inflammatory evidence.
- Counsel did not effectively cross-examine state witnesses or adequately elicit testimony of defense witnesses on direct examination.
- Counsel did not impeach state witnesses with "known highly-credible evidence."
- Counsel did not pursue a "direct defense to the charges" which was supported by a plethora of evidence.
- Counsel did not seek a limiting instruction vis-à-vis several portions of testimony.
- Counsel did not protect Dwyer's Fifth Amendment rights at trial and sentencing. In particular, counsel did not object to the use of Dwyer's unconnected, uncharged crime as an aggravating factor at sentencing.
- Counsel did not rehabilitate Dwyer when he misspoke on cross-examination in response to damaging testimony by a prosecution witness. (Dwyer notes that his testimony may have contradicted defense counsel's extensive cross-examination of the state witness in which his attorney was somewhat successful in his impeachment attempt.)
- Counsel failed to file a motion for a new trial within the time-limit due to ignorance of the law.

As I explain below, Dwyer is not entitled to § 2254 review of all these claims because he has not fully exhausted his state court remedies as to all these claims.  That said, in my review below I

3

generously address the claims that he did adequately exhaust in the state courts as being synonymous with the parallel conclusory claims in his 28 U.S.C. § 2254 motion. This can only benefit Dwyer because he is, as a rule, limited to the legal claims, see 28 U.S.C. § 2254(b)(1), and factual record, see id. § 2254(e), he developed in the state courts.

### *Dwyer's fully exhausted claims of ineffective assistance of counsel*

Section 2254(b)(1) of title 28 provides:

**(b)(1)** An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that--
   **(A)** the applicant has exhausted the remedies available in the courts of the State; or
   **(B)(i)** there is an absence of available State corrective process; or
   **(ii)** circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1). The claims contained in Dwyer's memoranda seeking review by the Maine Law Court of the state post-conviction court's denial of post-conviction relief are the claims that are fully exhausted. See Baldwin v. Reese, 541 U.S. 27, 29 (2004) ("To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim.")(citation omitted); see also Pike v. Guarino, 492 F.3d 61, 71 (1st Cir. 2007); Jackson v. Coalter, 337 F.3d 74, 85-87 (1st Cir. 2003).

In his counseled memorandum in support of his certificate of probable cause, Dwyer opined:

> The only evidence presented against Mr. Dwyer by the prosecution was the statement of DE. The only defense offered by Defendant's attorney was Mr. Dwyer's statement that he did not commit the crime. There was no physical evidence offered to convict. The entire case turned on the credibility of the witnesses. Where guilt or innocence depends entirely on the credibility of the accuser and the defendants, no error should be permitted.

(Mem. Support Appeal at 1.) Dwyer argued that defense counsel was ineffective for not calling witnesses to bolster his credibility in a case where the alleged victim had four other witnesses apropos the State's case, citing a ratio theory of bolstering. (Id. 1-2, 4-5, 14, 17.) He identified eight potential defense witnesses: Jeffrey Ham who could have testified that Steve Narbonne lied when he testified at trial that he left for work from his house on the morning of the alleged assault when in fact Ham picked him up at Dwyer's house (id. at 2); someone named O'Wayne would testify that he was at Dwyer's house the night before the alleged offense (id.); Jimmy Gatehouse could have testified that SR had visited Dwyer's house dozens of times after the allegations, that their relationship was wholesome, dispelling the prosecution insulation that Dwyer was trying to seduce her with alcohol (id. at 3); Gary Jones, SR's boyfriend, could have contradicted the prosecution's case by testifying that the couple had visited Dwyer's home frequently, he knew of SR's daily contact with Dwyer - instant messaging, telephone calls, and personal visits, including overnights -- that the relationship was wholesome, and that he had told Angel and Steve Narbonne about SR's contact with Dwyer (id.); SR's friend Theresa Abramo could testify that the two friends had almost daily contact with Dwyer since the alleged assault, including sleeping over at his home on several occasions, that Dwyer's and SR's relationship was wholesome, and that SR had Dwyer's house keys for several years (id. at 3-4)[4]; Richard Small and Richard Woodman could each have testified to Dwyer's and SR's contact and

---

[4]     In his pro se supplemental memorandum to the Maine Law Court seeking review of the post-conviction court's order, Dwyer represents:
> Counsel interviewed (P.I.) Teresa specifically for this purpose and subpoenaed her to testify at trial.  Immediately upon the state resting it[]s case, counsel called Teresa Abramo on her cellphone and he and Dwyer begged her to come in and testify.  Teresa however wanted no part of this case and no part in ratting her best friend out and causing her to be thrown out of the Narbonne['']s house and onto the streets with nowhere to go.  It was the defendant who made the call to not put Teresa on the stand after the telephone call.

(Pro se Suppl. Mem. at 5.) Dwyer states that this version of events contradicts the testimony of his attorney and the private investigator at the post-conviction hearing that Abramo was not called because she could offer harmful testimony. (Id. at 6.)

wholesome relationship (id. at 4); and Dwyer's mother, Patricia Dwyer could have testified that Dwyer's relationship with Steve Narbonne was volatile and describe several prank phone calls Steve Narbonne made to her home at all hours of the night, resulting in police reports (id.).

This memorandum also faulted defense counsel for not using limited funds for pre-trial investigation to explore bank records that would have backed-up Dwyer's assertion that the allegations were fabricated in retaliation for Dwyer's report to the Internal Revenue Service (IRS) and the Social Security Administration (SSA) that the Narbonnes were not reporting income from Steve Narbonne's painting jobs while he was on full-time disability. (Id. at 5.) Dwyer asserted that counsel failed to develop for trial Dwyer's story about the Narbonne's fraudulent and criminal activity over several years. (Id. at 13.) He informed his attorney that "he tried to call" the IRS and SAA and had made oral reports to both agencies before DE's allegations. (Id.) Steve Narbonne was receiving full disability from SAA while working fulltime according to Dwyer but counsel did not cross-examine these witnesses on the matter. (Id.) He failed to subpoena IRS, SSA, or bank records or call Jeffrey Ham to testify about how much money he gave Steve Narbonne for working in Ham's painting business. (Id. at 13-14.) Post-conviction counsel recognized that the post-conviction court "makes the point that Mr. Dwyer's written report to the IRS was subsequent to the offense date and therefore irrelevant." (Id. at 16.) "However," he opined, "the illegal activities of DE's mother and step father was an area of potential impeachment that would have undermined the overall image of the Narbonne[]s as being wholesome." (Id.)

In addition Dwyer argued that Steve Narbonne should have been cross-examined about a court-ordered counseling stemming from a Massachusetts operating under the influence conviction. (Id. at 5.) Dwyer thought that defense counsel could have ascertained who

6

Narbonne's counselor was and "been called about" Steve Narbonne's lies during his testimony concerning his work history and his relationship with his wife and children. (Id.) Dwyer envisioned that the counselor could have testified that Steve Narbonne told the counselor he was not using drugs or alcohol and Dwyer could testify that he had personal knowledge to the contrary. (Id. at 5-6.) With respect to Angel Narbonne, Dwyer complained that counsel never investigated whether she was on probation and was engaging in criminal activity including welfare and student loan fraud relating to the failure to report Steve Narbonne's painting income. (Id. at 6.) Dwyer contended that the bank records demonstrate that Steve Narbonne made $70,000 one summer. (Id.)

And then Dwyer explained to the Maine Law Court the many deficiencies of counsel in preparing him to testify. (Id. at 6-7.) He explained that he was not ready to admit to providing alcohol to minors at trial and that this admission was highly prejudicial (id. at 6) and counsel did not elicit testimony that Dwyer's relationship with Steve Narbonne was turbulent over the years, there being times when they would threaten each other and fight and then times of being best friends (id.). After Dwyer had made reports to the IRS and SSA, the two had a physical fight and then they were friends within a few weeks time and were friends on the night before the alleged assault but Dwyer's relationship with Angel Narbonne remained terrible because of the reports. (Id. at 6-7.) [5] And Dwyer wanted to testify that on the morning of the alleged assault Jeffery Ham called Steve Narbonne at Dwyer's home and Steve was picked up at Dwyer's home

---

5     In his pro se supplemental brief to the Maine Law Court seeking review of the denial of post-conviction relief Dwyer elaborates that he told his attorney that he had hurt Steve Narbonne "pretty seriously" just months before the sexual assault allegations and Narbonne ended up in the hospital for three to four days. (Pro se Suppl. Mem. at 10.)

7

and Narbonne and Ham proceeded directly to work (id. at 6), contradicting the testimony from both Steve and Angel Narbonne that Steve left for work from their residence.[6]

Dwyer further faulted defense counsel for not filing a motion in limine to prevent SR from testifying about Dwyer's supplying alcohol to her on the grounds that it was irrelevant to his guilt and was extremely prejudicial. (Id. at 8-9.) He described how the prosecutor first prevented SR from elaborating on her testimony to include a description of the alcohol provision by Dwyer and then elicited the testimony without an effort by defense counsel to object or call for a sidebar. (Id. at 9.)

With respect to the testimony of DE, Dwyer faulted his attorney for not effectively cross-examining her. He explained that counsel knew that DE had not written a statement and stresses that his attorney should have understood the importance of using prior inconsistent statements as the primary means of defense in a case where there was no physical evidence. (Id. at 9-10.) "Therefore," he argued, "defense counsel should have had his PI interview DE, he should have made a motion to compel discovery to get Det. Millet[t]'s notes about DE's testimony, he could have asked if the grand jury testimony was recorded and asked that a transcript be made if it was." (Id. at 10.)[7] Apropos DE's cross-examination, he maintained:

> Defense counsel made a crucial mistake when cross examining [DE]. Trial Transcript, Page 51, line 14 Q. That is not at all specific as to when your dad is going to be home or not, is it? A. Right. It was essential that he stopped there. By continuing his questions from Page 51, line 17 through page 52 line 9, he undermined all that had been accomplished in making it clear that Mr. Dwyer, could not have known when Steve Narbonne was coming home, and replaced it

---

[6] In his pro se supplemental brief to the Maine Law Court seeking review of the denial of post-conviction relief Dwyer states that Steve Narbonne admitted to Dwyer's post-conviction counsel that he left for work from Dwyer's house rather than from his own residence. (Pro se Suppl. Mem. at 12.)

[7] In his Section 2254 reply memorandum Dwyer stresses his belief that counsel should have called Millett to testify about the taking of DE's statement. (Sec. 2254 Reply Mem. at 8.) He describes Millett as "blatantly and maliciously" preventing DE from signing her statement. (Id.) In a somewhat contradictory vein he thinks Millett could have "testified about the several reliable ways to take a victim[']s statement that would ensure it[]s accuracy, such as videotape, audiotape, having the victim carefully read and sign the statement OR having the witness write her own statement in her own words and her own writing." (Id.)

8

>with reinforcing in the mind of the jurors the idea that Mr. Dwyer was ordering [DE] to lie to her parents. Defense counsel never asked any questions about Mr. Dwyer's suggestion that they go for a ride and the fact that she had gone for rides with him before this would have suggested to the jury an innocent reason for his visit.

(Id. at 10.)

Dwyer further faulted counsel in this memorandum for not establishing that he had a wholesome father/daughter relationship with SR. (Id. at 10.) He points to the fact that he bought clothes for her and paid for her ear piercing yet, rather than elicit this evidence, counsel pounded home the supply of alcohol issue, asking her if Dwyer supplied her with alcohol, when the alcohol gravy train stopped, and whether if he continued to supply alcohol would she be still hanging out with him. (Id. at 10-11.) He maintained that his attorney should have objected when the prosecutor asked Dwyer if he supplied SR and other under-aged individuals with alcohol and should have asked for an instruction that made it clear that this was not relevant to Dwyer's guilt or innocence. (Id. at 13.) "The examination of the witness should have been done in [a] way that made her more sympathetic to Mr. Dwyer than his adversary." (Id. at 11.) And Dwyer insisted that counsel should have asked SR and DE about DE's desire to see her father more and wanting to live with him instead of the Narbonnes, asking both girls about the times when Steve Narbonne disciplined DE. (Id. at 12.)

Dwyer also raised a challenge to counsel's performance with respect to the testimony of Detective Scott Dunham. (Id. at 12.) He contended that counsel should have subpoenaed the person who did the testing and processed the clothing with respect to the police investigation. (Id.)

In Dwyer's pro se supplemental memorandum addressed to the Maine Law Court he summarized that there were three theories of defense after the defense had read the prosecution's

9

file and spoken to Dwyer: (1) The Narbonne's quest for revenge; (2) DE's desire to live with her biological father;[8] and (3) SR is a good friend of Dwyer's -- as well as the victim's and the Narbonnes' -- and maybe SR believed Dwyer over DE.[9] (Pro se Suppl. Mem. at 1.) He faulted counsel for not filing a motion in limine rather than waiting for trial to object to SR's first complaint testimony. (Id. at 6.) He suggested that the prosecution may have acted in bad faith/with subterfuge in using SR instead of the Narbonnes or the investigating officer to relay DE's report of assault in an effort to get in the evidence of Dwyer's supplying alcohol to minors. (Id. at 6-7, 8-9.)[10] He stressed that SR was asked 169 questions at trial and only one was about whether or not DE told her that she had been assaulted, while SR was asked 115 questions about her relationship with Dwyer and twelve questions about the alcohol. (Id. at 9.) In his Section 2254 reply memorandum, Dwyer describes this testimony on the supply of alcohol as taking over the trial. (Sec. 2254 Reply Mem. at 8.)

Nowhere in these lengthy memoranda does Dwyer mention the failure to move for a new trial or any challenge to his sentencing proceeding.

*State Court Decisions*

The state post-conviction court held a full evidentiary hearing and issued an excellent decision discussing Dwyer's post-conviction claims. The post-conviction justice was the same judge who had presided at trial. He addressed trial counsel's alleged ineffective assistance from

---

[8] Dwyer describes rather difficult household environments pertaining to both Steve Narbonne and DE's biological father. (Id. at 2.) He states that defense counsel was most keen on this approach and insists that "this is not his defense, Dwyer does not support such a defense and does not believe that [DE] fabricated the false allegations." Id. at 3.)

[9] He describes this third defense as the "Didn't do it defense." He then goes on to criticize it as a theory, stating that "whether or not[ SR] remained friends with Dwyer after the allegation is not admissible as to either [SR's] or [DE's] credibility" (Id. at 4.) He describes this evidence as irrelevant to his guilt. (Id.) He faults his attorney for attacking SR's credibility, saying her testimony "was beyond reproach." (Id. at 5; see also id. at 6.) He also rejects the notion that his attorney could have called SR's friend Teresa Abramo to testify to SR's post-allegation relationship with Dwyer on the grounds that it would have been impermissible extrinsic evidence. (Id.)

[10] Dwyer laments that there was no evidence presented that Dwyer had teenage sons who were associated with the teenage girls that he supplied alcohol to. (Id. at 9.)

the investigation phase through the way he handled trial testimony. The hearing justice discussed at some length the issue of furnishing alcohol to SR and the claims regarding limiting instructions. The post-conviction justice found justification for the tactical decisions made by counsel and he further found that even if counsel had followed the course that Dwyer now advocates, it is unlikely those strategic changes would have altered the outcome of the trial. (Post-conviction Order at 3-10. State App. C.) In one footnote the court addressed Dwyer's contention, repeated in Dwyer's pro se memorandum to the Maine Law Court, that Narbonne and O'Wayne used drugs during the early hours of May 22, 2004, at Dwyer's residence. (Id. at 4 n.5.) Observing that Dwyer did not prove that he provided this information to his trial counsel, the court observed that offering this information would have been a "double-edged sword" and would not have tarnished the testimony of DE. (Id.)

        In turn, the Maine Law Court ruled:

> We have reviewed the judgment entered in the Superior Court, and have fully considered the petition and its request for a certificate of probable cause, as well as the accompanying memorandum in which petitioner asserts that his trial counsel's representation was ineffective because he failed (1) to conduct an adequate pretrial investigation, (2) adequately impeach witnesses at trial, and (3) to obtain the exclusion of evidence of supplying [alcohol] to minors. The Superior Court conducted an evidentiary hearing on the petition, rejected Dwyer's arguments, and denied the petition. We find that the Superior Court committed no error and did not exceed its discretion in denying the petition for post-conviction review. Based on our review, we determine that no further hearing or other action is necessary to a fair disposition of this matter.

(Order Denying Certificate Probable Cause at 1, State App. D.)

        I have read the transcript of Dwyer's trial. I do not disagree that the transcript does tell a story of a trial heavy on prosecution and light on defense witnesses. Conviction was in no way a slam-dunk for the prosecution. The victim's testimony was a little erratic on the details. It is conceivable that counsel could have been more aggressive in investigating and presenting

11

Dwyer's defense. However, I have fully considered the various shortfalls identified by Dwyer and I conclude that "the assumed deficiencies" do not present "'a reasonable probability that,' but for the [deficiencies], 'the result of the proceeding would have been different.'" Spisak, 2010 WL 86341 at 10 (citing Strickland, 466 U.S., at 694.) Having reviewed the transcript of the post-conviction evidentiary hearing, I could identify no 28 U.S.C. § 2254(d)(2) shortfall. For instance, there is ample support for the court's conclusion that Dwyer had not provided counsel with the information necessary to pursue some of Dwyer's desired witnesses and evidence. The post-conviction judge, who as the trial judge also had first-hand knowledge of the criminal proceedings, concluded that the deficiencies highlighted by Dwyer, many of which fell short of the inadequate performance prong, would not have impacted the outcome of trial. I therefore cannot find the Maine Court's decision rejecting Dwyer's "ineffective-assistance-of-counsel claim[s] to be an 'unreasonable application' of the law 'clearly established' in Strickland." Id. (citing 28 U.S.C. § 2254(d)(1)).

*The Motion to Supplement*

Finally, I address an issue about the 28 U.S.C. § 2254 petition that arose when Dwyer filed a motion for leave to supplement the record with a protection from abuse dismissal order Dwyer obtained against Steven Narbonne on September 12, 2003, and printouts of four instant message exchanges allegedly between Dwyer and [SR] after the assault allegations surfaced. (Doc. Nos. 10, 12-2.)[11] The State responded to Dwyer's motion by arguing: "Petitioner, who represented himself at the state postconviction review evidentiary hearing, did not offer these documents during the hearing. Indeed, when Petitioner mentioned the Instant Messages during his closing argument, Superior Court Justice Warren told him that the messages were not in

---

[11] I entered an order reserving ruling on his initial motion, indicating that Dwyer was to file the proposed supplementation.

evidence. (Evid. Hearing Transcript at 200)." (Opp'n Mot. Suppl. at 1, Doc. No. 13.) I entered an order for the State to provide additional briefing. Dwyer v. Maine, Civ. No. 09-379-B-W, 2009 WL 3633325, 2 (D.Me. Nov. 2, 2009). The State responded to that order (Doc. No. 18).

Now, with the benefit of a thorough review of the entire state court record, with regards to the instant messages I conclude that the State is correct: "This isn't a case where a habeas petitioner obtains new evidence after a fact-finding hearing in the state courts, and offers to supplement the record in federal court with the new evidence in the context of a habeas petition. In fact, Dwyer had these records *before trial* – and defense counsel actually utilized the IM's in his cross-examination of [SR]." (State Resp. Order to Br. at 4.)[12] Although the actual print-outs of the IM messages may not have been formally admitted into evidence in the post-conviction proceeding, the substance of the messages (and how it related to his ineffective assistance claims) was, for all intents and purposes, before the state courts. Although Dwyer was not successful in having the records admitted into evidence at the close of the post-conviction proceeding, he did explain how they related to his theory that defense counsel should have utilized them at trial and the judge was attentive to his explanation. (See Post-conviction Hr'g Tr. at 200- 203.) The post-conviction court clearly understood that it was Dwyer's theory that counsel should have introduced authenticated versions of the instant messages at trial. (Id. at 203.) In his brief to the Maine Law Court seeking a certificate of probable cause, post-conviction counsel addressed the print-outs of the three instant messages and argued:

> Those messages would have shown the amount of contact between Mr. Dwyer and [SR] and that the relationship … was wholesome, like a father and daughter. Mr. Dwyer told defense counsel that he had almost daily contact with [SR] and multiple times some days, via IM. The IM's would show that contact was

---

[12] Dwyer indicates in his pro se supplemental memorandum that he saved these IMs in October 2005 (the trial commenced December 20, 2005) and his attorney told him before trial that they were unauthenticated. (Pro se Suppl. Mem. at 4.) According to Dwyer, the defense contacted America Online and were told that they saved IMs for four months but his attorney did not subpoena the records or file a motion in limine. (Id.)

13

> initiated by [SR]. The IM's would show that [SR] mentioned numerous times that she would be visiting Mr. Dwyer. These emails would show that there was a close friendship between Mr. Dwyer and [SR] even well after the allegations were made by [DE] and that often the conversation ended "Love Ya" which was said by both sides. In an IM [SR] begs Mr. Dwyer not to get her to admit in court that they are friends and in daily contact or try to get her to admit she told Mr. Dwyer over the telephone that she did not believe [DE]'s story of the abuse. SSR was told that Mr. Dwyer taped that conversation. In an IM [SR] begs Mr. Dwyer not to play the tape or she will tell the court that Mr. Dwyer bought her alcohol. [SR] was homeless at the time and living with the Narbonnes. She was afraid if the Narbonnes found out she was friends with Mr. Dwyer, having daily contact with him and if she had said she did not believe [DE] they would ask her to leave and she would be on the street. Her testimony at trial had many falsehoods and defense counsel did not do anything to impeach her. [SR] with the help of the ADA spoke about being at Mr. Dwyer's home one time when Mr. Dwyer purchased alcohol for minors, but defense counsel never elicited the many times she was at Mr. Dwyer's house when no alcohol was involved and the almost…constant communication with Mr. Dwyer. If this testimony was elicited from [SR] by defense counsel, and asked her about her talk with Mr. Dwyer that was taped, she would not appear to be supportive of [DE], if defense counsel had properly subpoenaed the IM[]s he could have used them to refresh [SR]'s recollection of events or impeach her.

(Mem. Support Appeal at 7-8.) My discussion above, assumes that the post-conviction court and the Maine Law Court knew of the instant messages and understood Dwyer's argument as to how they related to his defense.

As for the copy of the protection from abuse documentation, the State is right that the document submitted actually reflects a dismissal of protection from abuse complaints Dwyer filed because Dwyer failed to appear at the hearings. Assuming that I could consider this evidence in this proceeding, I do not see how my consideration of this document could possibly sway the resolution of Dwyer's 28 U.S.C. § 2254 Sixth Amendment claims. I therefore deny the motion to supplement.

*Conclusion*

For the reasons stated above, the motion to supplement is **DENIED.** I recommend that the Court deny Dwyer 28 U.S.C. § 2254 relief. I further recommend that a certificate of appealability should not issue in the event Dwyer files a notice of appeal because there is no substantial showing of the denial of a constitutional right within the meaning of 28 U.S.C. § 2253(c)(2).

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

January 15, 2010.